# The Mechanic.[*]

# The Free State.[*]

## (District Court, E. D. Pennsylvania. November 9, 1881.)

1. Admiralty—Tug and Tow—Temporary Absence of Tug—Mooring of Tow —Extraordinary Storm.

A tow of canal barges was left by the tugs having them in charge in an apparently safe harbor, moored to a wharf and floating platform, the tugs proceeding in search of another tow whose arrival was expected. During the absence of the tugs an extraordinary storm arose, and the barges were swept away. Their owners claimed that the loss was due to the absence of the tugs, and the defective condition of the platform to which the tow was moored. Held, that the temporary absence of the tugs, in pursuance of uniform custom, did not constitute negligence. Held, further, that the evidence failed to sustain the allegation that the loss was due to defects in the platform.

Libel in personam by the owners of two canal barges against the owners of two tugs, to recover damages for injuries to the barges alleged to have been caused by the negligence of the tugs. The facts were as follows:

On October 4, 1877, the barges Mechanic and Free State, loaded with coal, were, with other barges, taken in tow by the tugs Sherman and Sawtelle, belonging to respondents, at Fairmount dam, on the river Schuylkill, for a voyage to Bordentown, New Jersey. About 6 o'clock P. M. they reached a point on the Schuylkill below Gray's ferry bridge, and were there moored to a wharf and floating platform of logs, leased by respondents, and used for mooring boats. The platform consisted of logs running from the wharf up the river parallel with the bank, joined together by transverse boards, and fastened to the wharf and to trees on the bank. On the inner log were cleats used for fastening boats by their hawsers. The tow, consisting of five tiers of four barges each, and one tier of three barges, was made fast to this platform by lines from the inside boats to these cleats. The two tugs left the tow after it had been moored and proceeded down the river to meet an expected incoming tow. Not meeting this tow, the tugs turned back, but before reaching their own tow put in and moored at another landing. During the evening an extraordinary storm arose, accompanied by a freshet; the tow was swept from its moorings, and the Mechanic and Free State sunk. About the time the barges were set adrift the tugs came to their assistance, but were unable to save them, and were themselves driven ashore. Libellants' testimony was

*Reported by Frank P. Prichard, Esq, of the Philadelphia bar.

to the effect that the tugs could safely have returned to the tow before the storm reached its height; that the cleats on the platform were insufficient, defective, and rotten; and that the breaking of these cleats caused the loss. Respondents' testimony was to the effect that the violence of the storm was such as to prevent the tugs from immediately returning to the tow; that the cleats were properly constructed and in good condition, and had been recently inspected; and that the loss was due to the extraordinary violence of the storm.

*Edward F. Pugh*, for libellants.

*Alfred Driver, Henry R. Edmunds*, and *J. Warren Coulston*, for respondents.

BUTLER, D. J. The storm and flood in which the boats were lost are, of themselves, quite sufficient to account for the disaster. The loss must, therefore, be assigned to this cause, alone, unless contributory negligence be shown. The libellants charge such negligence, and specify three distinct instances in which they say it existed: *First*, in making up the tow; *second*, in being absent from it when danger threatened; and, *third*, in mooring the tow to a float in imperfect condition. The burden of proof is on the libellants.

I find nothing to justify the first specification; the tow was made up according to common usage. This point, indeed, was virtually abandoned on the argument. Nor do I find anything to justify the second specification. The boats were securely moored in a safe harbor,—where no danger had ever been experienced, and where, therefore, none could reasonably be expected. The respondents, having occasion to be temporarily absent, left the tow, in pursuance of uniform custom. When the storm came, or increased in violence, and the water rose, so as to create apprehension of danger, it was their duty to return, and make all proper efforts to save the boats. The evidence, however, justifies a belief that to return at this time was virtually impracticable. The suddenness and violence of the storm, and the darkness of the night, rendered such an effort unnecessarily hazardous, if not futile. Although the evidence is not harmonious, its preponderating weight sustains this view. I am by no means satisfied, however, that the respondents' absence contributed to the disaster. It seems quite probable that the result would have been the same if they had been present. The libellants, who were on the boats, saw no cause of alarm until the crisis was imminent, when nothing effective could be done. An increase of attachments to the float would probably have been useless. If the attachments had held fast it is reasonable to believe—(as the libellants' witness Malloy asserts) that the force of the wind, and current in the river,

would have swept the float, and everything connected with it, away. That a few boats remained fast, does not tend to prove that the entire tow might thus have been saved. The enormous strain of so many loaded boats, under the force of the storm and flood, must have been virtually irresistible. Nor is it probable the tugs could have held them, or rendered any essential aid, by taking the hawsers. The attempt made by this means, directly after the attachments to the float gave way, failed. The tugs could do little more than save themselves.

As respects the third specification, (principally relied upon by the libellants,) the witnesses who speak directly to the point are in serious conflict,—those called by the libellants saying that the logs and cleats were rotten and unsafe, and those called by the respondents saying they were sound and secure. Viewed in the light of this direct testimony alone, the fact would be in doubt. Considering the opportunity of the several witnesses to see and judge, it could not be said that the weight of evidence is with the libellants. Viewed in the light of surrounding circumstances, also,—the overhauling of the float some months before the accident, and the slight repairs required after this event, and the more significant fact that the tow was held for a considerable time under great pressure, and broke away only when the storm and flood had reached their height,—the decided weight of the evidence seems to be with the respondents.

No debatable question of law is involved in the case. The respondents were bound to the observance of such vigilance and care as the safety of the boats called for, under existing circumstances. They could not anticipate such a contingency as arose, and were not, therefore, required to prepare for it. It was not only extraordinary, but, so far as the witnesses know, unprecedented. Under ordinary circumstances,—in such weather as the respondents were justified in expecting,—the boats would have been entirely secure. When the extraordinary emergency arose no adequate provision for it was practicable.

Unfortunate as the libellants have been, they have no just claim on the respondents for compensation. The libels must, therefore, be dismissed, with costs.